## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| Semyon Kremer, individually and derivatively on behalf of Smile Land, Inc. and Inkvist, Inc. | **CIVIL ACTION** |
| Plaintiff, | **Case No. 3:19-cv-00887-BJD-JBT** |
| vs. | |
| Alexey Lysich, et al. | |
| Defendants. | |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Semyon Kremer ("Kremer" or "Plaintiff"), individually and derivatively on

behalf of Smile Land, Inc. ("Smile Land") and Inkvist, Inc. ("Inkvist DE") files the

foregoing proposed findings of fact and conclusions of law.

## I.  Preliminary Statement

1. Defendant, Alexey Lysich ("Lysich") breached his fiduciary duties to Kremer

and Smile Land when he:

a. In 2014, demanded, by his own admission, Kremer sign and deliver a
backdated agency agreement to an IRS auditor to support Lysich's wires of
$710,000 from Smile Land's accounts to Solinger Trading Ltd. ("Solinger"),
an off-shore company. (*N.T.* 7/11/22 118: 19-22, *see* P-21, P-87);

b. Directed Protogroup to terminate Kremer's compensation days after
Kremer's refused to execute the backdated document with no intention of
making additional payments in the future. (*Id.* 85:18-21);

1

c. Declined to provide Kremer with any of Smile Land's financial and operational information for nearly six years. (*Id.* 102:10-25, 103: 1-9);

d. Attempted to hold Kremer personally liable for an alleged inter-company related debt between Smile Land and Inkvist, Inc., a Delaware company. (P-27);

e. Exposed Kremer as a guarantor on Smile Land's license agreement with Days Inn Hotel (P-114), while at the same time removing a key source of income from Smile Land;

f. Ignored corporate formalities by not holding shareholder meetings and failed to have a plan to hold future shareholder meetings. (*N.T.* 7/11/22 101:2-20);

g. Misled Kremer that Defendant Protogroup, Inc. ("Protogroup") and Smile Land would operate as a single unit, and Kremer would enjoy economic benefits in both, when, in actuality, Lysich intended to usurp Smile Land's opportunities and divert them to Protogroup for his own personal gain; and

h. Indiscriminately transferred Smile Land's travel agency booking revenue, which historically accounted for nearly fifty percent (50%) of Smile Land's income revenue and totaled nearly one million dollars per year, to Protogroup without compensation to Smile Land and Kremer for the lost revenue stream. (*Id.* 164: 24-25, 165: 1-8, *see also* P-56, P-57, and P-65).

2. Defendant Protogroup[1] is the alter-ego of Smile Land because:

a. Protogroup intermingled, utilized, and portrayed Smile Land's assets as that of Protogroup in order to bolster Protogroup's efforts to secure a $40 million loan with banks and other prospective lenders. (*N.T.* 7/12/22 97:1-6, 99:2-10, *see also* D-101);

b. Lysich directed Smile Land to pay contractors, architects, and other professionals for Protogroup's development plans and costs. (P-91); and

---

[1] Lysich, Protogroup, and Smile Land are collectively referred to as the "Smile Land Defendants."

c. Protogroup usurped Smile Land's hotel developing corporate opportunities and converted Smile Land's travel agency booking revenue because its controlling shareholder, Lysich, moved around the revenues and opportunities to whichever company he saw fit. (*N.T.* 7/13/22 98:21-23).

## II.     <u>Findings of Fact</u>

### A. The Formation of the Parties' Business Relationship

3. In 1981, Peter Lysich befriended Kremer when they worked together in a grocery store in the former Soviet Union. (*N.T.* 7/12/22 222: 4-10).

4. In 1989, Kremer fled the former Soviet Union and immigrated to the United States as a religious refugee. (*Id.* 218: 6-22).

5. Between 1989 and 2005, Kremer obtained a degree in the United States, met his wife Yelena, had children, began working for the New York State Department of Finance, and established a life for himself and his family in New Jersey. (*Id.* 218: 23 – 221:11).

6. Kremer reconnected with Petr Lysich in 2005 while Petr was visiting the United States. (*Id.* 222: 18-23).

7. By 2005, Petr Lysich, who remained in Russia after the fall of the Soviet Union, established himself as a successful entrepreneur; he owned a series of supermarkets and hotels throughout Russia. (*Id.* 222: 24 – 223: 4).

8. In 2005, Petr Lysich approached Kremer with a business proposition: Kremer would assist Petr Lysich's expansion of his real estate and hotel business operations to the United States, and in exchange, Kremer would be entitled to an equal share of

the proceeds and a twenty (20%) ownership share of Lysich's companies in the United States. (*Id.* 223: 5-15).

9. Thereafter, Kremer and Petr Lysich formed Inkvist, Inc. in Nevada ("Inkvist NV") where Kremer owned twenty (20%) percent of the company's shares and Defendant Igor Fedorenko ("Fedorenko"), Petr's nephew, received eighty (80%) percent of the company. (*Id.* 223:22–224:9, 226:24–227:5, P-45).

10. Inkvist NV operated as a booking/travel agent for Petr Lysich's hotel while also seeking out new investment opportunities in the United States. (*Id.* 225: 1-13).

11. In 2006, Inkvist NV's first US investment was a condominium located at 113 N Bread Street, Philadelphia, Pennsylvania ("the Philadelphia Condo"). (*Id.* 225: 14-23, *see also* P-99).

12. That same year, Inkvist NV also acquired the Hotel Danica, a hotel in Montenegro; securing a mortgage totaling $350,380 against the Philadelphia Condo to cover part of the purchase price. (*Id.* 226: 12-16, *see also* D-101 and P-80).

13. Kremer personally guaranteed Inkvist NV's mortgage. (*Id.* 227: 11-14, *see also* P-80).

14. In addition to the Philadelphia Condo and the Hotel Danica, Inkvist NV acquired a residential rental property in Palm Coast, Florida. (*Id.* 223: 10-15).

**B. Smile Land**

15. In 2007, Petr Lysich wished to expand his US investment opportunities to build a hotel in Palm Coast, Florida. (*Id.* 233:25 – 234:4).

16. In July 2007, Petr Lysich and Kremer formed a new company based in Palm Coast, Smile Land, Inc. (P-51).

17. Like Inkvist NV, Kremer received 20% of the outstanding shares of Smile Land and Defendant Fedorenko received the remaining 80% of the outstanding shares. (*N.T.* 7/12/22 238: 22-25, *see also* P-52).

18. After its formation, Smile Land purchased a lot of land located at 120 N Garden Street in Palm Coast with the intention of building an "economy brand" hotel at the location. (*Id.* 223: 6-17).

19. Because Smile Land was a newly formed company, Smile Land's mortgage lender, Heritage Bank, required Kremer to provide a personal guaranty on the mortgage. (*Id.* 240: 9-18, *see also* P-5).

20. After acquiring the land, Petr Lysich directed Kremer to locate an economy hotel franchise for Smile Land's hotel. (*Id.* 243: 20-24).

21. In December 2007, Kremer secured Smile Land a contract with Wyndham to license and build a Days Inn Hotel. (P-114).

22. To secure the Days Inn license, Wyndham also required Kremer to personally guarantee the agreement, just as Kremer did with the Philadelphia Condo and Smile Land mortgages. (P-114).

23. To date, Kremer remains a personal guarantor on Smile Land's licensing agreement with Wyndham. (*N.T.* 7/13/22 208: 8-11).

24. From 2008 through 2010, Kremer oversaw the construction of Smile Land's Days Inn Hotel. (*N.T.* 7/12/22 249: 9 -19).

25. Despite still working full-time and raising two young children, Kremer traveled to Florida monthly throughout the construction process and dedicated all his available time to the development of the hotel. (*Id.* 249:20- 250:18).

26. In addition to being a shareholder of the company, Kremer was also Smile Land's president and sole director.  (*N.T.* 7/13/22 242: 7-9);

27. In May 2010, Kremer hired John Smarsh to serve as the hotel's manager. (*N.T.* 7/14/22 39: 7-9);

28. In September 2010, the Days Inn Hotel opened to the public. (*Id.* 12: 8-9).

### C. Inkvist NV Splits between Smile Land and Inkvist DE.

29. Between 2007 and 2011, Petr Lysich split Inkvist NV's holdings into separate companies. (*N.T.* 7/12/22 257: 1-7).

### i. *Inkvist NV transfers the Philadelphia Condo to Inkvist DE*

30. In 2007, around the same time Smile Land was formed, Petr Lysich directed Kremer to open another iteration of Inkvist, Inc. ("Inkvist DE"), this time incorporated in the State of Delaware. (*Id.*).

31. Immediately thereafter, Inkvist NV transferred the Philadelphia Condo to Inkvist DE. (*Id.*).

32. Kremer is a 20% shareholder of Inkvist DE. (*N.T.* 7/13/22 50:14-15).

33. Fedorenko, Inkvist DE's 80% shareholder, never involved himself in the operation and management of Inkvist DE or the condo. (*N.T.* 7/13/22 50:8-15).

34. To keep up with the mortgage payments, Inkvist DE rented the Philadelphia Condo and utilized the rent payments to cover the mortgage; which was still secured by Kremer's personal guarantee. (*Id.* 257: 8-16).

35. At times, when the property was vacant, the Lysiches would authorize Smile Land to cover the cost of the mortgage payments. (*Id.* 257: 12-23).

36. The Philadelphia Condo remained an asset of Inkvist DE until its sale via receivership in 2019 [Doc. No. 80].

### ii. *Inkvist NV's merger with Smile Land*

37. On April 16, 2008, Fedorenko transferred his shares in Smile Land to Defendant Alexey Lysich. (P-113).

38. In 2011, Inkvist NV merged into Smile Land, with Smile Land remaining as the surviving entity. (P-47).

39. In so doing, Smile Land assumed Inkvist NV's remaining assets: the Danica Hotel in Montenegro and the rental property in Palm Coast. (*N.T.* 7/12/22 256:14-23).

40. Smile Land also assumed Inkvist NV's travel agency revenue, which thereafter became a significant portion of Smile Land's income. (*Id*. 255: 19-23).

41. Smile Land and Inkvist NV's merger was necessary to account for the transfer of travel agency revenue from one company to the other. (*Id.*)

42. According to Smile Land's 2012 financial records, as of June 30, 2012, the travel agency revenue (approximately $499,465.30) made up 48.41% of Smile Land's income. (P-55).

43. In 2013, the travel agency revenue, totaling $895,896.46 for that year, accounted for 49.09% of Smile Land's overall income. (P-56).

44. Then, in 2014, Lysich's plan for Protogroup changed everything. (P-57).

**D. Protogroup, Inc.**

45. In 2011, Alexey Lysich received his green card and moved to the United States. (*N.T.* 7/11/22 123:12-14, *see also* N.T. 7/12/22 259: 3-8).

46. Likewise, in 2011, Defendant Lysich and his father Petr incorporated Protogroup, Inc. in Daytona Beach for the purpose of building a resort hotel along the Daytona Beach shoreline. (*N.T.* 7/12/22 259: 16-21, *see* P-60).

47. Though Kremer received no shares of Protogroup, he was nonetheless given the title of Vice Present of Protogroup. (*Id.* 262:8-9, *see* P-61).

48. Protogroup's registered address was 120 N. Garden Street, Palm Coast, FL; the address for Smile Land's Days Inn Hotel. (P-60, P-61).

49. In 2011, with its sights set on developing along the Daytona Beach shoreline, Protogroup's primary objective was to obtain financing to develop its resort. (*N.T.* 7/12/22 263: 15-19).

50. With respect to his role in Protogroup, Kremer's primary task was to be the point person in charge of the search for financing. (*Id.* 263: 20-25).

51. According to Alexey Lysich, Protogroup was seeking a loan for approximately $40 Million. (*N.T.* 7/11/22 62: 3-6).

52. In 2014, when Jeffrey Blass, a loan broker helping Protogroup with its lending, reviewed Protogroup's loan application, he told Lysich that Protogroup's loan would require both Smile Land and Kremer's personal guarantee. (P-11).

53. Lysich provided Blass with links to various documents supporting Protogroup's application, containing, *inter alia*, Smile Land's financial statements *and* Kremer's personal financial statements. (P-11, *see* P-12I and P-12J).

54. When Blass needed Kremer's updated and signed personal financial statement, Lysich directed Kremer to "give them the information.[2]" (P-11).

55. Additionally, Protogroup also circulated a brochure to potential lenders. (*N.T.* 7/12/22 97: 1-6, *see* D-101)

56. The brochure describes Protogroup as "a family company owning and operating a number of properties in different countries." (*Id.*).

57. The front page of the brochure identified Protogroup and, immediately below that, contained images for different assets portrayed as Protogroup's holdings:



(D-101).

58. Smile Land's Days Inn Hotel and Hotel Danica appear as Protogroup's assets on the brochure. (*Id.*).

---

[2] Lysich's instruction to Kremer was written in Russian; however, it was translated by Lysich at trial. (*N.T.* 7/11/22 74:13-16).

59. Smile Land's hotels are also identified as Protogroup's "owning and operating objects" on the brochure's following page:

- Danica Hotel, 3*, 34 rooms, located in Petrovac in Montenegro
- Days Inn Hotel, 3*, 119 rooms, located in Palm Coast, Florida, USA

(*Id.*)

60. When asked whether the advertisement contained truthful representations of Protogroup's assets, Lysich testified: **"Advertising sometimes presents things better than they are, in fact."** (*Id.* 98:21-24) (emphasis added).

61. Lysich admitted that the advertisement referred to Protogroup and Smile Land as a singular company under the umbrella of Protogroup, Inc. (*Id.* 99: 2-10).

62. At trial, Smile Land's accountant, Al Schulz ("Schulz") was shown a copy of the Protogroup brochure for the very first time. (*N.T.* 7/11/22 231:18-25).

63. Alarmed to see Smile Land's assets on the brochure, Schulz testified, "[I]f Days Inn is not actually a Protogroup, then they shouldn't be advertising it as such." (*Id.* 234: 8-9).

64. Additionally, Schulz testified that in 2014 Lysich directed him to divert Smile Land's travel agency revenue to Protogroup. (*N.T.* 7/11/22 165: 3-8).

65. Schulz testified that prior to 2014 the travel agency revenue was historically categorized as Smile Land's income. (*Id.* 160:24 – 161:1).

66. In 2014, however, Smile Land only reported $17,954.41 in travel agency income, a significant decrease from its prior years, and accounting for only 0.76% of its 2014 revenue. (P-57).

67. Conversely, in 2014, Protogroup, for the first time, reported $549,621.85 in travel agency revenue as of November 30, 2014. (P-67).

68. Lysich did not explain to Schulz why the revenue was being diverted. (*N.T.* 7/11/22 165: 3-8).

69. Schulz admitted that redirecting the travel agency income to Protogroup diminished Smile Land's value "quite substantially." (*Id.* 219:18 – 220:4).

70. Both Kremer and Smile Land relied on the travel agency income as a consistent stream of revenue which remained with the same company for 8 years[3]. (*Id.* 204: 12-21).

71. Kremer never objected to the transfer of revenue between Protogroup and Smile Land because the two companies were always treated singularly and because Kremer expected to financially benefit from Protogroup. (*Id.* 204:22 – 205:3).

72. In 2014, Kremer's monthly compensation also went from Smile Land to Protogroup, reinforcing Kremer's financial expectations in Protogroup.[4]  (P-66).

---

[3] As a successor by merger, Smile Land is a continuation of Inkvist NV; who reported the travel agency revenue from 2005 through the 2011 merger. (*N.T.* 7/13/22 203:1 – 204:11).

[4] Since Kremer was paid by 1099, based on advice from his accountant, Kremer formed a New Jersey company named Vector SLK, LLC for the sole purpose of receiving compensation from Smile Land and Protogroup. (*N.T.* 7/13/22 11:16-23).

### E. The 2016 IRS Audit and Kremer's Termination

73. In September 2016, the IRS audited Protogroup and Smile Land's 2014 tax returns. (*N.T.* 7/13/22 150: 23-25).

74. Schulz handled the initial phases of the audit and communicated directly with Kremer about documents requested by the IRS, such as documentation related to years of transactions between Smile Land and Inkvist DE. (*N.T.* 7/13/22 175: 9-11, 176: 18-24, *see* P-18).

75. When Kremer worried that Schulz wanted him to create a backdated loan agreement between Smile Land and Inkvist DE, Schulz stated, **"I don't want you to do that. I don't want you to go back and do anything illegal, like redoing documents from years ago."** (*N.T.* 7/11/22 177:5-9) (emphasis added).

76. Therefore, to memorialize the payments between Smile Land to Inkvist over the years, Schulz asked Kremer to provide the IRS with a line of credit agreement effective October 31, 2016. (*N.T.* 7/13/22 25:3-12, P-83).

77. The IRS inquiry also sought an explanation for four wire transfers made by Lysich in September 2014 totaling $710,000. (P-18).

78. According to Lysich, he made those wire transfers to Solinger, a Bahamian Company, to account for brokerage fees due to Solinger for the sale of fruits and vegetables. (*Id.*)

79. Schulz testified that Lysich directed Smile Land to report income from fruits and vegetables, totaling approximately $1.3 million only in 2014, but not for any other subsequent or prior year.  (*N.T.* 7/11/22 168:10-169:9).

80. Kremer contacted Petr and Alexey Lysich and asked them for documentation supporting the Solinger payments because Alexey Lysich was the one who actually made the wire transfers. (*N.T.* 7/13/22 30: 6-19).

81. In response, on October 25, 2016, the Lysiches sent Kremer two e-mails, minutes apart, each containing a document named "Agency Agreement N. 1" (the "Agency Agreement"). (P-20, P-21).

82. The purported Agency Agreement was dated January 21, 2014 and also identified Kremer as the "Principal" of Smile Land with a space for Kremer's signature on the last page. (P-87).

83. The October 25 e-mails were the first time Kremer saw the Agency Agreement; he had never seen, let alone singed, any contract between Smile Land and Solinger before then. (*N.T.* 7/13/22 34: 11-16).

84. According to the Agency Agreement, Smile Land owed Solinger a 1% "agency fee" for brokering the sale of fruits and vegetables. (P-87).

85. At trial, Lysich admitted that he directed Kremer to sign the Agency Agreement.[5] (*N.T.* 7/11/22 118: 13-22).

86.  Lysich also admitted he never saw a signed version of the agreement at any other point in time. (*Id.*).

87. Concerned about the legality of delivering a backdated agreement to the IRS, Kremer conferred with a corporate attorney and, thereafter, advised Lysich that he could not sign the backdated Agency Agreement. (*N.T.* 7/13/22 36: 8-10).

88. Lysich admitted that Kremer refused to provide him with a signed copy of the Agency Agreement. (*N.T.* 7/11/22 119: 8-10).

89. On November 1, 2016, a few days after Kremer's refusal, Protogroup did not pay Kremer his monthly compensation. (*N.T.* 7/13/22 37: 1-2).

90. Kremer contacted Petr Lysich the next day and learned he would no longer receive any further compensation from the companies. (*Id.* 40: 2-4).

91. On November 17, 2016, Smile Land sent Kremer a resolution removing him as the company's director and appointing John Smarsh in his place. (P-54).

### F.  The Freezeout and Lysich's Retaliatory Conduct

92. Before November 1, 2016, Smarsh regularly e-mailed Kremer a daily "flash" report of the Days Inn's income and expenses. (*N.T.* 7/14/22 47:12-23).

---

[5] This was a departure from Lysich's prior affidavit, where he attested that "he never asked plaintiff to execute a backdated agreement." (P-88).

93. Following Kremer's termination, Smarsh stopped sending Kremer the flash reports with the exception of a year-end report at the end of 2016. (*Id.* 48: 3-8, *see* P-25).

94. To date, Kremer has not received any additional flash reports. (*Id.*)

95. After his removal, Kremer did not hear from Lysich until six months later. (*N.T.* 7/13/22 42: 12-18, *see also* P-22).

96. On April 13, 2017, Lysich e-mailed Kremer a draft of the IRS's report concerning the $710,000 wire payment. (P-86).

97. The draft report concluded:

a. Solinger is a Bahamian shell company "used by international parties to move money around the world in a manner to illegally reduce their tax burden" and was featured in the *Panama Papers*[6];

b. Alexey Lysich provided the IRS auditor with an unsigned version of the Agency Agreement;

c. The IRS rejected the explanation provided to them by Alexey Lysich that the $710,000 was an ordinary business expense, finding that amount could not reflect a 1% agency fee in 2014, as Smile Land would otherwise have had to show $71 million dollars of produce sales for that year; and

d. The $710,000 wire should be treated as a dividend payment made to Alexey Lysich.

(P-86).

---

[6] "The *Panama Papers* is a publicly available resource published by the International Consortium of Investigative Journalists, which lists the contents of documents obtained from a controversial Panamanian law firm used by wealthy individuals all over the world for a variety of reasons, some of which are potentially nefarious." (*N.T.* 7/12/22 34:24 – 35:5)

98. While Lysich later claimed the IRS resolved the deduction in Smile Land's favor, Justyna Mueller, a CPA hired by Lysich to address the IRS audit, confirmed she: (1) never took any steps to determine what actual dollar amounts would have to be delivered for Solinger to earn a 1% fee of $710:000 (*N.T.* 7/12/22 153: 21 – 24); (2) did not see any evidence that Smile Land generated $71 million in fruits and vegetable sales in 2014 (*Id.* 154:15-18); and (3) *only provided the IRS auditor with customs and shipping invoices that did not show any monetary values to support the $710,000.* (*Id.* 164:5-9).

99. In addition to the April 13 e-mail, on April 12, 2017, Kremer received a letter from Brian Jones, an attorney with Shutts & Bowen, LLP, which alleged that during Kremer's tenure as director of Smile Land, Smile Land transferred funds in the amount of $77,719.19 "purportedly to an entity known as Inkvist DE;" and that they were "unable to establish that Inkvist DE was ever formed or in existence." (*Id.*)

100. Kremer was shocked by this letter because not only did Alexey Lysich know that Inkvist DE existed, the transactions between the two entities had been on Smile Land's books and financial records yearly since 2012. (*N.T.* 7/13/22 46:3-10, *see also*, P-55)

101. Schulz confirmed that Lysich was aware of the transactions between Smile Land and Inkvist DE from 2012 onward and that the transactions were always

reflected on Smile Land's financial statements and tax returns. (*N.T.* 7/11/22 181:11-18).

102. The April 12 letter also attempted to hold Kremer "**individually**" liable for Inkvist DE's debt, and demanded Kremer repay Smile Land $77,719.19, plus additional interest of $13,412.05 within 15 business days. (P-27) (emphasis added).

103. Kremer provided the April 12 letter to his attorney, Ely Goldin.

104. Ely Goldin testified that the April 12 demand was particularly concerning because: (1) Lysich was aware of Inkvist's existence; and (2) there was nothing to suggest Kremer had any personal liability for a loan between two entities. (*N.T.* 7/12/22 20: 9-21:24).

105. On May 17, 2017, Kremer received a second letter from Brian Jones, stating that he now represented Igor Fedorenko on behalf of Inkvist DE. (*Id.*).

106. The May 17 letter included a resolution signed by Fedorenko replacing Kremer as director of the Inkvist DE with Fedorenko. (P-46).

107. Ely Goldin testified that the April 12 and May 17 letters were "diametrically opposed to one another" because the first letter questioned whether Inkvist DE ever existed while the second letter purported to act on behalf of the very same company which supposedly never existed. (*N.T.* 7/12/22 23: 14-24).

108. On May 19, 2017, Ely Goldin responded to Brian Jones' April 12 and May 17 letters. (P-29A).

109. Mr. Goldin's May 19 letter: (1) set forth Kremer's position in response to the actions taken and demands made by Lysich and Fedorenko; (2) demanded Kremer receive a pro-rata dividend payment in light of the IRS' draft findings related to the $710,000 wires; and (3) invited counsel to engage in discussions as to the best way to effectuate a business divorce between the parties. (*Id.*).

110. Brian Jones never responded to the May 19 letter, nor did he respond to any of Ely Goldin's subsequent efforts to reach him via e-mail and phone. (*N.T.* 7/12/22 27: 17-18, 33: 10-18).

111. Brian Jones admitted, via affidavit, that Shutts & Bowen never spoke with Fedorenko; rather, Alexey Lysich was the sole point of contact for all Defendants.[7] (P-101).

112. On July 25, 2017, Ely Goldin sent another letter to Shutts & Bowen containing a demand for the inspection of Smile Land's corporate records pursuant to §607.1602 Florida Statutes. (P-30).

113. The July 25 letter asserted that Protogroup had wrongfully usurped Smile Land's assets and opportunities, citing the Protogroup brochure and a news article where Smile Land's assets were represented as those of Protogroup. (*Id.*).

---

[7] Notably, before this case was transferred to the Middle District of Florida, New Jersey USDC President Judge Freda Wolfson expressed concern over Mr. Jones' affidavit holding, "Brian Jones, Esq., a partner at Shutts & Bowen, ***curiously*** states that the firm has never had any direct communication with Fedorenko, nor does the firm possess a direct line of communication to Fedorenko, ***notwithstanding*** his and the firm's previous representation of Fedorenko in a related legal matter, as recently as last year." [Doc. 29] (emphasis added).

114. Ely Goldin testified that making Smile Land's counsel aware of Protogroup's comingling of Smile Land's assets was important because "those are the kind of things that make courts upset[.]" (*N.T.* 7/12/22 40:4-7).

115. The July 25 letter also demanded review and inspection of corporate records pursuant to Section 607.1602(1) of the Florida Statutes. (P-30).

116. Brian Jones never responded to the July 25 letter and Smile Land never produced any records. (*N.T.* 7/12/22 27:19-20, 40: 13-17).

117. At its deposition, Smile Land[8] admitted that it received the July 25 demand letter, but Lysich made the determination that Kremer was "**not entitled to those documents**" despite Kremer's status as a 20% shareholder of Smile Land. (*N.T.* 7/12/22 115:13 – 116:5) (emphasis added).

118. At trial, Smile Land attempted to walk back the deposition testimony, now asserting that it could not confirm Kremer's shareholder status because he had not returned any of the corporate books and records.[9] (*N.T.* 7/14/22: 44-10-19).

119. Tellingly, Smarsh did not challenge the validity of his own appointment as director of Smile Land, despite the resolution of his appointment containing Kremer's signature in his capacity as a 20% shareholder. (*Id.* 54:5 – 56:3).

---

[8] Smarsh testified as Smile Land's corporate designee and its deposition and at trial.

[9] Smile Land admitted that it did not review the corporate records delivered to its attorneys in discovery. (*Id.* 45:10-22)

120. Smile Land admitted that Smarsh did not send Kremer a formal demand to return corporate documents until August 2017, nine months *after* Kremer's termination. (*Id.* 71:20- 72:24).

121. Smile Land also admitted that despite being aware that Kremer was represented by counsel in August 2017, the demand for corporate documents was never sent to Kremer's counsel. (*Id.*).

### G. After May 17, 2017, Inkvist DE was a Runaway Company

122. Prior to his removal from Inkvist DE, Kremer listed the Philadelphia Condo for sale. (*N.T.* 7/13/22 56:22 – 57:5).

123. On May 3, 2018, Kremer received an offer to sell the Philadelphia Condo for $512,000. (P-100).

124. No longer a director, Kremer did not possess the authority to accept the offer; therefore, Kremer delivered the offer to Fedorenko and to Lysich's counsel[10]. (*N.T.* 7/13/22 58:20-24).

125. Fedorenko never responded to the offer, and it was evident that Fedorenko had abandoned his duties as director, which necessitated the appointment of a receiver to liquidate and sell the Philadelphia Condo. (*Id.* 59: 9-11).

---

[10] Lysich and his father, Petr, both represented by Shutts & Bowen at the time, were ordered to accept service on behalf of Fedorenko. [Doc. 29]

126. In late 2019, the receiver sold the Philadelphia Condo for $440,000, which was $72,000 less than the May 3, 2018 offer. (P-107).

127. Inkvist DE also incurred receiver fees of $61,899 and property management fees of $19,596 in the process, all of which would have been avoided had Fedorenko not abandoned the company. (*N.T.* 7/13/22 62:2-4).

### H. Smile Land's Valuation and the Value of Protogroup's Usurpation of Smile Land's Opportunities

128. Charles Lunden, a CPA accredited in business valuations, opined to a reasonable degree of professional certainty that the ***uncontroverted*** fair value of Kremer's shares in Smile Land totaled **$2,388,750**. (*N.T.* 7/12/22 158: 9-10, *see* P-74A).

129. Mr. Lunden's valuation relied on Lysich's personal financial statements submitted to prospective lenders prior to the commencement of litigation. (*Id.* 157:24 – 158:4, *see also* P-12C).

130. Mr. Lunden's methodology is based upon widely accepted treatises, which consider prelitigation estimates of business values as the best available evidence. (*Id.* 158:15 – 159:1).

131. This part of Mr. Lunden's valuation does not account for lost business opportunities, prejudgment interest, punitive damages, and/or attorney's fees. (*Id.* 159:19-24).

132. Mr. Lunden testified that his fair value of Kremer's shares remained at $2,388,750 on October 31, 2016, as the company's hotel revenues in 2016 were consistent with the previous years. (*Id.* 212: 9-24, *see also* P-25).

133. Mr. Lunden also testified that Kremer's shares should be valued at their fair value – without the application of any discounts – because of Kremer's claims of shareholder oppression. (*Id.* 144:20-145:2).

134. Additionally, Mr. Lunden opined to a reasonable degree of professional certainty that the pro-rata value of Kremer's share in Smile Land's stolen corporate opportunities usurped by Protogroup totaled $**21,654,250.** (*Id.* 151:1 – 152:6).

135. Mr. Lunden testified that the $21 Million figure was derived from Lysich's personal financial statements and contemplated the value of Smile Land *and* the value of the corporate opportunities that would have otherwise remained with Smile Land had Lysich not diverted them to Protogroup. (*Id.*).

136. Lunden testified that the $21 Million figure represented the best available indicator of the amounts of lost business opportunity that Smile Land no longer had because it was in Protogroup, and therefore was deprived to Kremer. (*Id*. 161: 6-11).

137. Defendants offered no counter-valuation; nor did Defendants offer any evidence to refute Smile Land's value or refute the opportunities usurped by

Protogroup. To the contrary, Defendants concede that a fair value valuation is the appropriate methodology. [*See* Smile Land Defendants' Trial Brief, Doc. 255, p.8][11]

138. Kremer has not received any information concerning Smile Land's operations in the last five and a half years, despite remaining a shareholder of record through present date. (*N.T.* 7/13/22 67: 3-8).

## III.    <u>Conclusions of Law</u>

139. Kremer is a 20% shareholder of Smile Land and not, as Defendants claim, a "mouse" asking for a "cookie." (*N.T.* 7/11/22 27:15-19)[12].

140. From 2005 through 2016, Kremer trusted the Lysich family, dedicated all his available time to advance the family's plans in the United States, and was loyal and faithful to the family until Lysich asked Kremer to do something illegal.

### A. Lysich Breached His Fiduciary Duties to Kremer and to Smile Land

141. Under Florida law, a breach of fiduciary duty requires proof of: (1) the existence of a fiduciary duty; and (2) the breach of that duty such that it is the proximate cause of the plaintiff's damages. *Taubenfeld v. Lasko*, 324 So. 3d 529, 537-38 (Fla. 4th DCA 2021) (internal citations omitted).

---

[11] "[T]o the extent the Court may seek to order an equitable buyout of Plaintiff's shares in Smile Land, if any, the Court should direct the purchase of those shares at their fair value."

[12] During opening, defense counsel stated: "I was telling my wife about this case and she told me about a children's book. Give a mouse a cookie, he wants a glass of milk. Give a mouse a glass of milk, he wants a napkin. Give the mouse a napkin, he wants a mirror to see if he got all the milk mustache off of his face…[e]ssentially, that's what we have here with Mr. Kremer." (*N.T.* 7/11/22 27:15-22).

142. Corporate directors and officers owe a fiduciary duty to both their corporation and shareholders and are required to act in good faith and in the best interest of the corporation. *Id.* at 538.

143. Fiduciary obligors may not "either directly or indirectly, in their dealings on behalf of the fiduciary beneficiary…make any profit or acquire any other personal benefit or advantage, not also enjoyed by the fiduciary beneficiary, and if they do, they may be compelled to account to the beneficiary." *Id.* at 539

144. "Officers and directors of a corporation are liable for damages to the corporation which result from a breach of their trust, a violation of authority, or neglect of duty." *Id.* (quoting *Flight Equip. & Eng'g Corp. v. Shelton*, 103 So. 2d 615, 627 (Fla. 1958)).

145. "The corporation is not the personal piggy bank for any one shareholder simply because that shareholder may have a controlling interest in the corporation." *Zold v. Zold,* 880 So. 2d 779, 780 (Fla. 5th DCA 2004).

146. "Usurpation of a corporate opportunity is a species of a breach of fiduciary duty and a breach of the duty of loyalty by seeking to advance one self's interest over that of the corporate entity." *Antaramian Props., LLC v. Basil St. Partners, LLC,* 2012 Bankr. LEXIS 5680, at *1 (Bankr. M.D. Fla. Dec. 7, 2012)

### i.    *A fiduciary duty exists*

147. Despite Defendants' challenge to Plaintiff's shareholder status in Smile

Land, the evidence that Kremer is a 20% shareholder is overwhelming and

unequivocal:

> a. Many of the corporate resolutions signed by both Kremer and Alexey
> Lysich identify Kremer as a shareholder, including the November 17, 2016
> resolution removing Kremer as a director of Smile Land (P-113);
>
> b. Smile Land's share certificates identify Kremer as a 20% shareholder (P-
> 52);
>
> c. The Days Inn licensing agreement identifies Kremer as a 20% shareholder
> of Smile Land (P-114); and
>
> d. Kremer's financial statements, produced by Lysich to prospective
> Protogroup lenders reflect Kremer's shareholder status in Smile Land. (P-
> 12I).

148. Kremer is a minority shareholder of Smile Land, therefore, Lysich owes

Kremer a fiduciary duty and a duty of loyalty.

### ii.    *Lysich breached his fiduciary duty in several ways*

149. The Southern District of Florida's recent decision in *Agnelli v. Lennox

Miami, Corp.* is applicable here. 2022 U.S. Dist. LEXIS 125346 (S.D. Fla. July 14,

2022).

150. In *Agnelli*,[13] the circuit court held that Agnelli, a shareholder of Lennox Miami Corp., breached his fiduciary duties to the company and its shareholder when he: (1) used the company's assets for his personal gain; (2) engaged in self-dealing by diverting the company's corporate opportunities to an unrelated entity in which Agnelli maintained an interest; (3) submitted fraudulent documents on behalf of Lennox to the U.S. Government; and (4) misled Lennox's accountants that certain non-business expenditures were legitimate business expenses of Lennox. *Id.* at *45.

151. Similarly here, Lysich breached his fiduciary duty when he:

a. Demanded Kremer execute a backdated Agency Agreement to satisfy an IRS' auditor's investigation into Lysich's wire transfers to an off-shore company;

b. Provided the IRS with an unsigned and fabricated Agency Agreement purportedly entered between Smile Land and Solinger;

c. Attempted to illegally hold Kremer personally liable for inter-related company debts;

d. Diverted Smile Land's hotel opportunities and travel agency revenues to Protogroup, where Lysich is the majority shareholder, without adequately compensating Kremer or Smile Land for its lost value;

e. Claimed that Smile Land's existing travel agency revenue was Lysich's money which he could move around to any company as he saw fit;

f. Represented to the company's accountants that the $710,000 wire transfers were legitimate business expenses, despite: (1) Every Smile Land director and accountant confirming that Smile Land was not in the business of selling

---

[13] Coincidentally, *Agnelli* also involved a hotel business, an international shareholder, and legal representation by Shutts & Bowen.

fruits and vegetables[14]; (2) the only supporting documentation to justify the sale of fruits and vegetables were customs labels without any monetary values on them; (3) Smile Land not reporting $71 million dollars of revenue in 2014 to justify a 1% agency fee to Solinger of $710,000; and (4) excluding any revenue related to fruits and vegetables in Smile Land's books and records ever again;

g. Declined to provide Kremer with Smile Land's financial and operational records from November 1, 2016 to present day and admitted he has no plans of doing so in the future;

h. Permitted Protogroup to utilize Smile Land's assets and offered to collateralize and provide Smile Land's guarantees on Protogroup's loans without compensation;

i. Admitted that he has no intention of compensating Kremer in the future; and

j. Engaged in a series of retaliatory actions against Kremer after learning of the potential adverse IRS determination.

152. It is notable that Lysich, the 80% owner of Smile Land, could have signed the Agency Agreement, yet he refused to do so; *instead, he submitted an unsigned agreement bearing Kremer's name.* (*N.T.* 7/11/22 123:22-24).

153. Lysich's submission of the Agency Agreement bearing Kremer's name to the IRS is similar to *Agnelli*, where the breaching shareholder submitted an application on behalf of the company to U.S. Immigration Services bearing the name and signature of the company's other shareholder, without his knowledge and

---

[14] *See N.T.* 7/11/12 168:7-14 (Schulz); *see also N.T.* 7/13/22 157:19-158:8 (Mueller); *see also N.T.* 7/12/22 112:19-21 (Smarsh).

consent. *Agnelli*, at \*44 (holding that submitting a forged visa application for on behalf of Lennox to the U.S. government was a breach of Agnelli's fiduciary duties).

154. At trial, Lysich's contradicted himself numerous times regarding his dealings with fruits and vegetables:

a. Lysich told the IRS auditor that the $710,000 represented Solinger's 1% brokerage fee and provided the auditor with the unsigned Agency Agreement. (P-87);

b. At trial, Lysich testified that the fruit and vegetable business was done solely by Kremer and that Lysich "**never dealt with vegetables or fruits**." (*N.T.* 7/11/22 131:7-12) (emphasis added);

c. Mere hours later, Schulz testified that, in 2014, Lysich specifically *directed* Schulz to apply the revenue to Smile Land: "I've got a new category of income. We've -- we're -- I've got some sales of fruits and vegetables that I'm putting on this particular entity." *(N.T.* 7/11/22 168:2-18); and

d. After Mueller testified that the supporting documents submitted to the IRS auditor did not contain any financial values to support $710,000 in agency fees, Lysich changed his testimony to suggest, for the first time, that the $710,000 actually represented the sale of fruits and vegetables and not a 1% brokerage fee. *(N.T.* 7/13/22 257:22-25).

155. Lysich provided no evidence to support his altered testimony and, applying the weight of the evidence, this Court should find Lysich incredible.

156. Likewise, Lysich's argument that the travel agency income belonged to Lysich and could be directed to any company as he saw fit is unavailing and has been rejected by courts in this Circuit. *See Bar-Am v. Grosman (In re Grosman)*, 2007 Bankr. LEXIS 1844 \*54-55. (Bankr. M.D. Fla. May 22, 2007) (rejecting an

owner's justification that he was repaying his cash advance and therefore could transfer money out of jointly owned company without compensating the co-owner).

157. In *Bar-Am*, the court held that the transfer of the funds without appropriately compensating the co-owner of the jointly owned company amounted to willful and malicious conversion, at the company and its other owner's detriment. *Id.*

158. The same is true under Delaware law. *See Taubenfield*, 324 So. 3d ad 538 n.1 (Florida courts may look to Delaware for corporate doctrines); *see also Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1459 n. 22 (11th Cir. 1989) ("We rely with confidence upon Delaware law to construe Florida corporate law. The Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines.").

159. Under Delaware law, "if the directors use their power as fiduciaries to transfer themselves assets of the company, they ***must*** compensate the company for the value of those assets and may not profit at the expense of the shareholders." *Union Ill. v. Korte*, 2001 Del. Ch. LEXIS 173, at *29-30 (Ch. Nov. 28, 2001) (emphasis added).

160. This is especially true when a fiduciary diverts the revenues of one company to another company for their own personal gain. *See QC Communs., Inc. v. Quartarone*, 2014 Del. Ch. LEXIS 149 *34 (Ch. Aug. 15, 2014) (holding a defendant-shareholder breached his duty of loyalty when he diverted the company's revenues and opportunities to a company solely owned by the defendant).

30

161. In *QC Communs., Inc.*, the court determined that plaintiff was entitled to recover all of the diverted revenues holding that, "once disloyalty [by a fiduciary] has been established, the standards evolved in the Delaware courts require that a *fiduciary not profit personally from his conduct*, and that the beneficiary not be harmed by such conduct." *Id.* at *36 (emphasis added).

162. Similarly, Florida's dissolution statute bestows this Court with the equitable power to revert the looted assets and opportunities back to the company from which those opportunities were taken. *See Foster-Thompson, LLC v. Thompson*, 2007 U.S. Dist. LEXIS 43206, at *23-25 n.9 (M.D. Fla. June 14, 2007).

163. In *Foster-Thompson*, this Court held that an LLC's co-member's diversion of business to her solely-owned new company presented sufficient evidence of the member's breach of her duty of loyalty and care. *Id.* at *32-33

164. Here, from 2005 through 2014, the travel agency revenue was an asset of Inkvist NV and Smile Land, as a successor by merger.

165. Lysich's decision to unilaterally transfer Smile Land's historic travel agency revenue, as well as other Smile Land opportunities, to Protogroup without compensating Kremer and Smile Land for the lost value is unjustified, unsupported, and is a breach of Lysich's duty of loyalty.

166. Lysich's contention that the revenue was his to move around as he wanted only further reinforces that Lysich never intended to honor his obligations and duties and was, and continues to be, only focused on his personal gain.

167. Lysich's repeated breaches have deprived Kremer and Smile Land of their opportunities, revenue, value, compensation, and are the proximate cause of Kremer's harms.

### B. Protogroup is the Corporate Opportunity of Smile Land and Lysich's Treatment of the Companies Warrants Alter-Ego Liability

168. In applying the alter-ego theory, several factors should be considered, including whether corporate formalities are observed; whether one corporation dominates another by virtue of its ownership, control, and congruency of established goals; and whether there is a transfer or commingling of assets between the corporations. *In re Brickell Inv. Corp.*, 85 B.R. 164, 165 (Bankr. S.D. Fla. 1988).

169. There is sufficient evidence to support alter-ego liability against Protogroup:

    a. Lysich dominated and controlled both Smile Land and Protogroup;

    b. Lysich testified that he could transfer the assets and opportunities of Smile Land to Protogroup as he saw fit;

    c. Lysich admitted that he knowingly provided lenders with false information representing Smile Land's assets as Protogroup assets testifying, **"Advertising sometimes presents things better than they are, in fact."** (*N.T.* 7/12/22. 98:21-24);

    d. Lysich admitted that Protogroup held itself out as a singular company which included Smile Land. (*Id.* 99:2-10);

e. Lysich directed Smile Land to pay contractors, architects, and other professionals for Protogroup's development plans and costs. (P-91);

f. From 2014 until his removal, Protogroup paid Kremer's compensation which included his work as a director of Smile Land (*N.T.* 7/14/22 47:4-15); and

g. Lysich impermissibly diverted Smile Land's hotel opportunities into Protogroup.

170. This Court, applying Delaware law, has held that alter-ego liability extends to the usurpation of corporate opportunities. *See Antaramian Props., LLC v. Basil St. Partners, LLC,* 2012 Bankr. LEXIS 5680, at *78 (Bankr. M.D. Fla. Dec. 7, 2012)

171. Under Delaware law, a corporate officer **may not** pursue a corporate opportunity for his own benefit if (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the officer will be placed in a position contrary to his duties to the corporation. *Id.* (citing *Johnston v. Greene*, 35 Del. Ch. 479, 121 A.2d 919 (Del. 1956)).

172. Each of those requirements are satisfied here.[15]

173. First, Smile Land was always financially able to undertake the Daytona Beach opportunity; in fact, Smile Land's financial viability, revenue, and longevity

---

[15] As set forth above, Florida courts routinely look to Delaware law to interpret corporate governance. *Int'l Ins. Co*, 874 F.2d at 1459 n. 22.

of business in the United States was necessary to collateralize Protogroup's funding efforts. (P-11).

174. Second, Smile Land is in the same line of business, already owning two hotels - the Days Inn and the Hotel Danica in Montenegro.

175. Third, Smile Land had an interest and expectation in the Protogroup project; not only was Smile Land asked to serve as a guarantor on the project's funding, but Smile Land's assets were conveyed to Protogroup to bolster Protogroup's financial portfolio.

176. As Kremer testified, Smile Land and Protogroup were always viewed as "the same company" with an expectation that Smile Land's shareholders would realize a financial benefit from Protogroup. *(N.T.* 7/13/22 204:22- 205:23, *see also* P-11[16].)

177. Lastly, Lysich is the majority owner of Protogroup and Smile Land; putting the Daytona Beach opportunity into Protogroup and transferring Smile Land's revenues to Protogroup increased Protogroup value, to Lysich's benefit and at the expense of Smile Land's value, contrary to Lysich's fiduciary duties to Smile Land.

---

[16] Suggesting that Smile Land should be made a part owner of the Daytona Project to resolve the issue of not having an American citizen on the loan.

178. Protogroup and Smile Land's singular operation is also supported by Protogroup's assumption from Smile Land of the travel agency revenue and Kremer's compensation, even while he worked for both companies.[17]

179. The usurpation of opportunities and operation of Protogroup and Smile Land as a singular family company warrants the treatment of Protogroup as an opportunity and alter-ego of Smile Land.

### C. This Court Should Exercise Its Equitable Powers Under § 607.1434 and Order Smile Land to Purchase Kremer's Shares at Fair Value

180. The Florida Business Corporation Act permits a court to order the dissolution of a corporation when the corporate assets are being misapplied or wasted, causing material injury to the corporation; or the directors or those in control of the corporation have acted, are acting, or are reasonably expected to act in a manner that is illegal or fraudulent. *Fla. Stat. § 607.1430(1)(b).*

181. As an alternative to directing the dissolution, this Court may, instead, order a purchase of the shareholder's shares. *Fla. Stat. § 607.1434(c).*

182. In their Trial Brief, the Smile Land Defendants have conceded an order directing the purchase of Kremer's shares *"at their fair value"* as the appropriate equitable remedy. [Doc. No. 255, p.8] (emphasis added).

---

[17] Prior to 2014, Smile Land paid Kremer for his work for both Smile Land and Protogroup.

183. Florida courts support ordering an equitable buyout in lieu of dissolution. *Acoustic Innovations, Inc. v. Schafer,* 976 So. 2d 1139, 1143 (Dist. Ct. App. 2008) (awarding a frozen-out fifty percent (50%) shareholder his equal value of all direct and indirect distributions made by the defendant, plus the fair value of the plaintiff's shares at the time of his forced removal of a company and also directing the majority shareholders and the company to purchase the oppressed shareholder's 50% shares at their fair value).

184. In *Acoustic Innovations, Inc.,* the Fourth Circuit District Court of Appeals affirmed the order directing the shareholder's buyout, holding that the buyout was "**intended to ensure that [the shareholder] receives the money and is not a duplicate award of damages.**" *Id.* (emphasis added).

185. Here, Lysich's breaches, namely the misapplication corporate assets and opportunities of Smile Land and demand that Kremer provide the IRS with an illegal backdated agreement, are harms that warrant equitable relief.

186. Dissolution can be avoided here by requiring Lysich and Smile Land to purchase Kremer's shares at fair value.

187. After being frozen out for almost 6 years, in order to ensure that Kremer receives and actually collects the fair value of his shares of Smile Land, an order directing the buyout of Kremer's shares is necessary.

### D. This Court Should Award Apply the Fair Value Method in Valuing Kremer's Shares of Smile Land.

188. The Smile Land Defendants agree that "fair value 'means the value of the shares as of the close of business on the day prior to the shareholders' authorization date, *excluding* any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable.'" [Doc. 255] (citing *Boettcher v. IMC Mortg. Co.*, 871 So. 2d 1047, 1051-5252 (Fla. 3d DCA 2004) (emphasis added).

189. Florida legislation has historically defined fair value as precluding an application of any discounts.[18] *See Agnelli* at *34 (holding that fair value excludes the application of discounts for lack of marketability and control).

190. Charles Lunden provided *uncontroverted* testimony that as of October 31, 2016, the fair value of Kremer's 20% shares in Smile Land was **$2,388,750.**

191. Mr. Lunden relied on Lysich's 2014 pre-litigation financial statements and Smile Land's 2015 and 2016 flash reports, which according to Dunn's treatises on damages is the best evidence of fair value.[19] (*N.T.* 7/12/22 158:15 – 159:18).

192. This Court should order Smile Land to purchase Kremer's shares at its fair value of **$2,388,750**, plus statutory interest from October 31, 2016.[20]

---

[18] *See also* Fla. Stat. §§ 605.1061(5)(c), 607.1301(5)(c) and 620.2113(4)(c)

[19] This Circuit has adopted Robert Dunn's treatises. *See Lary v. Bos. Sci. Corp.*, 2014 U.S. Dist. LEXIS 172866 *29 (S.D. Fla. Dec. 15, 2014) (citing to Robert Dunn in valuing lost profits).

[20] Kremer is also entitled to interest at the statutory rate from the date of the freezeout, as set under Fla. Stat. § 55.03. *See Agnelli*, at *186 (awarding interest from the valuation date).

### E. This Court Should Also Award Kremer the Pro-Rata Value of Smile Land's Stolen Opportunities, Lysich's Dividend Distributions, and Impose Punitive Damages against Lysich

#### i. *Lysich impermissibly diverted Smile Land's opportunity in the Daytona Beach project to Protogroup, leading to Protogroup being valued at nearly $100 million dollars*

193. Florida recognizes the corporate opportunity doctrine. *Cramer v. Palm Ave. Partners, LLC*, 611 B.R. 457, 476-77 (Bankr. M.D. Fla. 2019) (finding judgment in favor of investors for the usurpation of corporate opportunities when a company's managing member arranged for his other company to acquire land that his jointly-owned company could have otherwise acquired).

194. The corporate opportunity doctrine precludes a corporate fiduciary from taking an opportunity for himself that the corporation has an interest in. *Id.*

195. "If there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, **the law will not permit him to seize the opportunity for himself.**" *Id.* (emphasis added)

196. The remedy for a usurpation of corporate opportunity is the recovery of any profit made from it. *See Farber v. Servan Land Co.*, 541 F.2d 1086, 1088 (5th Cir.

1976) (holding if a corporate opportunity existed, the corporation and its stockholders would be entitled to profits from the opportunity).

197. Lysich was a shareholder of Smile Land as of 2008, and therefore, Lysich owed duty of loyalty to Smile Land and Kremer from that moment on.

198. By 2011, Smile Land was financially viable, could be funded and undertake the Daytona Beach hotel project, and had already successfully acquired and operated two hotels.

199. When presented with the opportunity to develop a hotel in Daytona Beach, Lysich was dutybound to provide that opportunity to Smile Land.

200. Lysich breached that duty when he seized the Daytona Beach opportunity and delivered it to Protogroup, a company that excluded Kremer as a shareholder.[21]

201. On his personal financial statements, Lysich's 63.8% shares in Protogroup are valued at $61 million dollars, meaning Protogroup's total value is roughly **$95 Million**. (P-12C).

202. Protogroup's only asset is the Daytona Beach hotel, which should be viewed as Smile Land's lost opportunity.

---

[21] Following Kremer's removal, and throughout the entirety of this litigation, Lysich has attempted to maintain that Protogroup and Smile Land are separate and unrelated entities. In doing so, Lysich has basically admitted to delivering Smile Land's opportunity in the Daytona Beach hotel project to Protogroup without compensating Smile Land or Kremer for its lost value.

203. The uncontroverted value Kremer's 20% share of Smile Land's lost corporate opportunity at **$19,123,500**. (*N.T.* 7/12/22 160:1-23, *see* P-74A).

204. Under the corporate opportunity doctrine, this Court should revert the entire Protogroup opportunity to Smile Land and award Kremer his share of the value of the lost opportunity.

### ii.    Kremer is entitled to a pro-rata dividend payment for Lysich's $710,000 wire transfer

205. Under Florida Law, a distribution may be treated as a dividend even if the corporation has taken no formal action to designate it as such. *Alliegro v. Pan Am. Bank*, 136 So. 2d 656, 660 (Fla. Dist. Ct. App. 1962) (defining dividends as "payment to the stockholders as a return upon their investment").

206. Despite categorizing the $710,000 wire transfer as a "business expense," Lysich failed to present any evidence that the supposed 1% agency fee due to Solinger was, actually, a legitimate expense of Smile Land.

207. At trial, Mueller testified she: (1) did not provide the IRS auditor with the agency agreement along with her other submissions (*N.T.*7/13/22 152: 24-153:2); (2) the documents she provided to the IRS contained no monetary values of product or cost (*Id.* 164: 1-9); (3) took no steps to add the $710,000 (*Id.* 164:10-12); and (4) *solely* relied on information provided by Lysich without ever speaking to Smile Land's other officers, directors, or accountants. (*Id.* 151: 8-9, 158: 7-9, 19-25).

208. This Court should therefore treat the $710,000 as a dividend payment to Lysich and award Kremer **$177,500**, which represents an equal 20% dividend payment to Lysich's $710,000 wire transfer. (P-29)

### iii.    *Lysich's conduct and retaliation against Kremer was vexatious, outrageous, and justifies the imposition of punitive damages and an award of attorney's fees*

209. A defendant may be held liable for punitive damages when he/she is personally guilty of intentional misconduct. *Fla. Stat. § 768.72.*

210. Further, punitive damages are recoverable for breach of fiduciary duties. *Conboy v. Black Diamond Props., Inc.*, 2010 U.S. Dist. LEXIS 74474, at *31 (M.D. Fla. July 23, 2010).

211. Lysich's actions are willful and constitute intentional misconduct, such that punitive damages should be awarded. *See Bar-Am,* at *55 (holding that the transfer of jointly owned company's money for personal gain and without equal dividend payments constituted willful and malicious conversion).

212. Lysich's retaliated against Kremer following the initial adverse IRS determination by illegally attempting to hold Kremer individually liable for a company debt and directing Kremer to sign and deliver to a government official an unlawful backdated agreement, demonstrating the behavior of a reckless individual who refuses to recognize that he has a duty of loyalty to anyone other than himself.

213. To deter Lysich from repeating this behavior again, punitive damages are warranted.

214. Fla. Stat. § 607.1431(5) also permits this Court to award attorneys' fees against a party who acts in a vexatious manner and in bad faith during the proceedings; Lysich's behavior has been vexatious at all times, including through trial.

215. This Court should award Kremer attorney's fees and permit the submission of evidence related to attorney's fees.

iv. **This Court Should Award Plaintiff the Balance of the Escrow Funds Related to Inkvist DE**

216. Under Delaware law, which applies to Inkvist DE, a claim for breach of fiduciary duty requires: (1) that a fiduciary duty existed; and (2) that the defendant breached that duty. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

217. Damages flowing from the breach of fiduciary duty are liberally calculated. *Thorpe by Castleman v. CERBCO*, 676 A.2d 436, 444 (Del. 1996)

218. Fedorenko is a defaulted party who has no ties to the United States.

219. When Fedorenko removed Kremer and appointed himself as the director of Inkvist DE, he kept Kremer's personal guarantee on the Philadelphia Condo's mortgage.

220. Fedorenko never actually took any steps to manage, direct, or oversee the company and its asset of the Philadelphia Condo. Instead, he abandoned his

obligations and allowed Inkvist DE to remain unmanaged, even though doing so would likely expose Kremer to personal liability under the mortgage.

221. By ignoring the offer to sell the condo, Fedorenko caused Inkvist to go into a receivership.

222. The receiver eventually sold the Philadelphia Condo for $440,000, which was $72,000 less than the initial offer, and Inkvist incurred receiver and additional property management fees of $61,899.09 and $19,596.51, respectively.

223. Those costs and losses would have been avoided but for Fedorenko's breach of his fiduciary duties which resulted corporate waste and a depreciation of the value of Inkvist.

224. The total net proceeds that remain from Inkvist's liquidation in the receiver's escrow is **$99,018.05**, plus whatever interest may have accrued.

225. Fedorenko's actions and inactions were malicious and designed to expose Kremer to personal liability under the mortgage, warranting punitive damages.

226. Delaware law permits punitive damages in breach of fiduciary duty actions. *Albert v. Alex. Brown Mgmt. Servs.*, Nos. 04C-05-250 PLA, 04C-05-251 PLA, 2004 Del. Super. LEXIS 303, at *21 (Super. Ct. Sep. 15, 2004).

227. Therefore, Kremer is entitled to the entire escrow balance of **$99,018.05.**

## IV.    <u>Conclusion</u>

228. For the foregoing reasons, this Court should find in favor of Kremer, individually and derivatively, on his causes of action for Breach of Fiduciary Duty against Lysich and award Kremer damages which include: (1) reimbursement for any unequal dividend payments enjoyed by Lysich; (2) Kremer's pro-rata value of the hotel development opportunities diverted by Lysich from Smile Land to Protogroup; (3) statutory interest from the day of the freezeout to present; (4) punitive damages for Lysich's intentional and outrageous conduct; and (5) attorneys' fees.

229. Further, this Court should hold Protogroup jointly and severally liable as the alter-ego of Smile Land and Lysich.

230. This Court should order the equitable buyout of Kremer's shares in Smile Land at their fair value and direct Lysich and Smile Land to repurchase Kremer's shares in lieu of dissolution.

231. This Court should also award Kremer damages against Fedorenko in an amount no less than the sums held in the receiver's escrow.

232. This Court should also retain jurisdiction to determine the award of attorneys' fees, statutory pre-judgment interest, and further award any other relief this Court deems just.

Respectfully submitted,


**ALAN L. FRANK LAW ASSOCIATES, P.C.**

/s/ Alan L. Frank_____          /s/ S. Hunter Malin_____
Alan L. Frank, Esquire (*pro hac vice*)          S. Hunter Malin, Esquire
Jeffrey J. Goldin, Esquire (*pro hac vice*)          Hunter Malin Law, P.A.
135 Old York Road          5011 Gate Pkwy, Bldg. 100, Ste. 100
Jenkintown, PA 19046          Jacksonville, FL 32256
afrank@alflaw.net
jgoldin@alflaw.net
Attorneys for Plaintiff          **Dated: August 8, 2022**


## CERTIFICATE OF SERVICE


I certify that on 8th day of August, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


/s/ Jeffrey J. Goldin_____

Jeffrey J. Goldin, Esquire